**Federal Defenders**
OF NEW YORK, INC.

Eastern District
One Pierrepont Plaza, 16th Fl., Brooklyn, NY
11201 Tel: (718) 330-1200  Fax: (718) 855-0760

Tamara L. Giwa
*Executive Director and
Attorney-in-Chief*

Michelle A. Gelernt
*Attorney-in-Charge*

July 3, 2024

<u>BY ECF and Email</u>
The Honorable Rachel P. Kovner
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY 11201

Re: *United States v. Adderly Rafael Santos Familia*, 23-CR-10 (RPK)

Your Honor:

## PRELIMINARY STATEMENT



Mr. Santos with his three children

Adderly Santos Familia has lived a complex and enriching life, filled with triumphs, like the love of his children, and traumas, like the instability of his childhood. These experiences helped shape Mr. Santos into the person he is today. What does not define him is a momentary lapse in judgment. As a devoted father, his three children are his central motivation to be a better version of himself, now and for the future. A sentence of incarceration would significantly impact his children and the several other family members that he supports.

Here, a non-incarceratory sentence would be most appropriate to achieve the goals of sentencing.

1

## A stable family home.



(L)Mr. Santos age 3
(R) Son Matthew Pichardo age 1

Mr. Santos was born in Santiago, Dominican Republic on January 6, 1992 to Elba Tavares and Jose Santos. Mr. Santos' parents met in the Dominican Republic and eventually had Mr. Santos. His early childhood revolved around his mother, who primarily raised him. She was Mr. Santos' central source of stability, safety, and love. Although his parents' union did not last, he still regularly spent time with his father, his stepmother, and his half-brother Edward Santos, on the weekends. Ms. Tavares maintained a grueling work schedule as a healthcare professional to provide for her son. However, she devoted much of her time to ensuring Mr. Santos' safety and wellbeing. When Mr. Santos speaks of his childhood in Santiago, he recalls watching cartoons with his mother, doing homework with her help, waiting for her at the hospital where she worked, and visiting his grandmother. He spent many days playing baseball with his friends after school and on the weekends. Ms. Tavares preserved the innocence of his childhood despite living in a neighborhood that struggled with pervasive crime and violence. However, his life was completely upended when he eventually migrated to the United States.

Mr. Santos emigrated from the Dominican Republic to the U.S. when he was 12 years old. His father had already moved to the U.S. in 2000 and settled in Jackson Heights, Queens, when Mr. Santos was eight years old. His father would occasionally return to Santiago to visit Mr. Santos and his half-brother, Edward. Given his father's relocation, his parents determined that there were better opportunities for Mr. Santos in the U.S. When the time for departure finally arrived, they did not tell Mr. Santos why he was leaving the only home that he had known. All he knew was that it was time to leave. Mr. Santos' transition to the U.S. started with saying goodbye to his beloved mother. Mr. Santos was devastated as his mother meant everything to him. She was his role model and inspiration, and he aspired to follow in her footsteps as a healthcare professional when he grew up. In an instant, Mr. Santos was stripped from his comfortable life, not knowing when he would see his mother again. "I couldn't stop crying," he remembers. Mr. Santos went from spending every single day with his mother, to only hearing her voice through the phone.

2

<u>A difficult transition to a challenging new environment.</u>
"You see things that you never thought you would see." – Adderly Santos

As a new resident of Jackson Heights, Mr. Santos did his best to keep his head down and stay out of trouble. When Mr. Santos moved to the U.S., he lived with his father, stepmother, and his half-brother Edward. By 2004, Jackson Heights was a low-income neighborhood that was burdened by persistent crime and gang violence and had the ignoble distinction of being the "center of cocaine importation and distribution for the northeastern United States."[1] The area also attracted a heavy police presence, which unfortunately brought Mr. Santos and his neighbors ongoing feelings of unease, rather than comfort or safety.

Alongside the neighborhood challenges, Mr. Santos dealt with the tandem reality of acclimating as a recent migrant to the country. Migrant children often face numerous obstacles in accessing education, including "low-resources and [the lack of] academic and socio-emotional supports in their schools, lack of quality and culturally sustaining curriculum, and a lack of social workers and counselors with background and language-ability that reflects [the] newcomers' culture." [2] Mr. Santos struggled with intense separation anxiety from his mother and called her every day to seek the comfort and love that he was so accustomed to receiving at home in Santiago. PSR ¶37. Compounding his feelings of isolation was the fact that Mr. Santos' father worked long hours to provide for his family and was often not at home. Although his father and stepmother did their best to provide the boys with a safe and loving home, Mr. Santos could not be shielded from the hurt of a new and uninviting place.

By the time Mr. Santos matriculated to high school, he had found his stride. He attended Flushing International High School, where he built a strong network of over 30 friends and classmates. Although he did his best to avoid the violence in his community, the specter of violence deeply impacted his circle of friends. Like many high school students, he expected his friendship network to remain intact for several years into the future. Unfortunately, some of his friends would not survive beyond

---

[1] *See* Ian Fisher, "Jackson Heights Streets Familiar to Drug Cartels," The New York Times, May 11, 1993, https://www.nytimes.com/1993/05/11/nyregion/jackson-heights-streets-familiar-to-drug-cartels.html.
[2] *See* Valerie Strauss & Sophia Rodriguez, "Challenges that young immigrants face with U.S. public schools," The Washington Post, Oct. 12, 2022, https://www.washingtonpost.com/education/2022/10/12/challenges-immigrants-face-public-schools.

high school. In fact, most of those friendships ended due to deportation, incarceration, or death. PSR ¶38. One moment from high school remains embedded in his memory – when he witnessed one of his best friends get stabbed right in front of him when he was 16 years old. Although his friend survived the brutal knife attack, he was eventually murdered in another stabbing. Mr. Santos was stunned after witnessing the stabbing and devastated at his friend's untimely death, and was further disheartened at the dissolution of his network of friends. The ever-present violence in his community weighed on him severely. Studies have shown that such exposure to traumatic events may lead to negative externalities including PTSD and other mental health diagnoses, among other significant impacts on people's lives.[3]

      As Mr. Santos dealt with the repeated losses in his friends' circle, his family was there for him. His father and stepmother did their best to support him at home, and he maintained his close connection with his mother as she still lived in Santiago. To stay occupied and out of trouble, he visited his aunt's home in Manhattan on the weekends and attended church with his family, or spent time playing video games with his cousins and older brother. His family's love, care and stability made Mr. Santos resilient in an environment that would have otherwise destroyed his young life, as it did for his friends. His family continues to support him in one of his most difficult times in his life and will help ensure that he continues changing his life for the better, for himself and his children.

---

[3] *See* Emily Goldmann et al., *Pervasive exposure to violence and posttraumatic stress disorder in a predominantly African American Urban Community: The Detroit neighborhood health study*, 24 J. Traumatic Stress 6 (2011), https://onlinelibrary.wiley.com/doi/10.1002/jts.20705.

4

<u>Mr. Santos's Life Revolves Around His Children</u>
"Everything is different when you have kids . . ., you have someone behind you saying, 'I love you'. It's just a different feeling" – Adderly Santos

Toward the end of high school, Mr. Santos' life changed dramatically once again – when he became a father. When Mr. Santos was in the 11th grade, he and his then-girlfriend Emerly Pichardo, had their son Mathew Pichardo in 2011. Although they were mere teenagers themselves, Mr. Santos took his new responsibility as a parent incredibly seriously. In order to provide for his family, he left high school and started working full-time. He first worked as a cashier at McDonald's and then as a sales associate at Foot Locker. PSR ¶¶59-60. He moved Ms. Pichardo and their son into an apartment and did his best to be a present father and good provider. Nearly every penny earned went to putting food on the table and maintaining a roof over his new family's head. Mr. Santos later worked two jobs to make ends meet; he resumed his cashier position at McDonalds where he worked during the day and worked nights for an HVAC company. PSR ¶¶56-57. Although his relationship with Ms. Pichardo eventually ended several years later, Mr. Santos remains actively involved in Matthew's life. Matthew lives with his mother in Philadelphia and Mr. Santos speaks with him daily, regularly provides financial support, and spends time with Matthew during breaks from school. PSR ¶41.


Mr. Santos with his newborn son Matthew Pichardo

In 2018, Mr. Santos expanded his family with the birth of his daughter Jade Santos, with his former partner Janna Santos. He and Ms. Santos (no relation or marriage) were in a relationship for about five years, but are no longer together and focus on co-parenting Jade. Jade lives with Ms. Santos in Long Island and Mr. Santos provides weekly financial support for their daughter. PSR ¶42. Mr. Santos enjoys spending time with Jade and notes that "she's funny" when she recounts jokes that she learned at school.

In 2021, he welcomed his third child, a son Addriel Santos, with his most recent partner, Jamilee Romero. Although he and Ms. Romero are no longer in a relationship, they maintain a positive connection as co-parents, and she described Mr. Santos as an "amazing person." PSR ¶44. He does his best to spend time with

Addriel and looks forward to one day teaching his youngest son to play basketball and baseball like he played as a child. Mr. Santos has built strong and dedicated relationships with his children to provide them with the foundation of love that he had in his childhood.

Mr. Santos currently works two jobs to support his children. He works during the day for 3 Guys Industries, a trucking company in Long Island, where he helps manage the operations and logistics for the company's daily shipments. At night, he works as a security guard for a DJ, where he often travels extensively given the DJ's schedule.



Ms. Tavares, Matthew, and Mr. Santos

Most importantly, Mr. Santos has created an intergenerational relationship between his children and their grandmother. Ms. Tavares has now lived in the U.S. for several years and was able to finally reunite with her son and be actively involved in her grandchildren's lives. Mr. Santos speaks passionately when describing the interactions between his children and their grandmother: "They love her cooking, they love spending time with her, they love her." Reminiscent of his youth in Santiago, he enjoys watching his children spend time with their grandmother, reliving the memories he was fortunate enough to make as a child. With the help of his family, his mother, father, and his children's mothers, Mr. Santos created a village for his children where they know they can find unconditional love and support. A place where their grandmother can feed and hug them, and a place where their father will keep them safe because, as Mr. Santos says, "family is everything."

<u>A sentence of incarceration would severely affect Mr. Santos' family.</u>

Mr. Santos is a pillar in his family, financially and emotionally. He is deeply concerned for his children's wellbeing if he were incarcerated. Mr. Santos' children would bear the brunt of their father's imprisonment. The drastic impacts of having a parent incarcerated go well beyond the social stigma. Children between ages six to eleven who have incarcerated parents are more likely to experience "emotional

difficulties, low school engagement, and more problems in school."[4] The only thing that awaits Mathew, Jade, and Addriel with a father behind bars is the onslaught of



Mr. Santos and Jade

challenges that 1.7 million American children with incarcerated parents experience every year.[5] A sentence of incarceration will have the effect of punishing Mr. Santos' children with a traumatic experience that may reverberate throughout their lives.

Apart from his children, the people who raised and supported Mr. Santos would suffer as well. At 66 years old, Mr. Santos' father is now retired and suffers from high blood pressure, diabetes, and high cholesterol. PSR ¶45. Mr. Santos lives with and helps support his father, stepmother, and his stepmother's nephew, and they would struggle to cover their household expenses without Mr. Santos' income. Additionally, Mr. Santos regularly sends money home to his relatives in the Dominican Republic. The entire community of people who rely on Mr. Santos' support will be impacted by a custodial sentence.



---

[4] David Murphey & P. Mae Cooper, Research Brief, *Parents Behind Bars: What Happens to Their Children?*, Child Trends (2015), https://cms.childtrends.org/wp-content/uploads/2015/10/2015-42ParentsBehindBars.pdf.
[5] *Id.*

Mr. Santos will bear the brunt of collateral consequences with a felony conviction.

Mr. Santos has never had a felony conviction until his conviction in the instant matter. A felony conviction triggers a host of collateral consequences, including significant barriers to employment, education, and access to credit and financial services:

> Collateral consequences affect many areas of life. Some criminal convictions can lead to loss of civil status; a citizen may lose the right to vote, serve on a jury, or hold office; a noncitizen may be deported or become ineligible to naturalize. A conviction may make a person ineligible for public benefits, such as the ability to live in public housing or hold a driver's license. . . . A criminal conviction can also make a person ineligible for a license or permit necessary to be employed or to do business, or cause forfeiture of a pension. Criminal convictions can also affect family relations, such as the ability to have custody or visitation of one's child.[6]

In New York, a felony conviction can subject someone to 374[7] separate barriers to employment, including absolute bars on becoming a Certified Nursing Assistant,[8] a firefighter,[9] a security guard,[10] or even working as the director of a funeral home.[11]

A felony conviction may severely impact Mr. Santos' current position as a security guard, which provides the majority of his income. Losing his job would risk putting him in a precarious financial situation, which would affect his ability to

---

[6] Gabriel Jackson Chin, "Collateral Consequences," Academy for Justice, A Report on Scholarship and Criminal Justice Reform (Erik Luna et al., 2017), https://ssrn.com/abstract=2948025 (emphasis added).
[7] National Inventory of Collateral Consequences of Conviction, Collateral Consequences Inventory, https://niccc.nationalreentryresourcecenter.org/consequences.
[8] *See* 10 CRR-NY § 402.7 ("Where the criminal history information of a prospective employee reveals a felony conviction at any time for a . . . class B or C felony, any class D or E felony defined in articles . . . 155 [Larceny offenses], . . . of the Penal Law or . . . any comparable offense in any other jurisdiction, the Department shall propose disapproval of such person's eligibility for employment. . . .") (emphasis added and omitted).
[9] *See* N.Y.C. Admin. Code § 15-103(b).
[10] *See* N.Y. Gen. Bus. L. §§ 74(2), 89-h(4).
[11] *See* N.Y. Pub. Health L. § 3450(1)(b).

provide financial support for his children. Further, as noted in the PSR, Mr. Santos faces several additional collateral consequences, such as restrictions on public benefits, housing, and jury service, among a host of other consequences. PSR ¶79. Further, Mr. Santos has maintained a relatively stellar record while under pretrial supervision. Although Mr. Santos had two prior positive tests for marijuana in 2023, he has had no further violations in nearly one year.

<u>Mr. Santos' circumstances support a sentence outside the Sentencing Guidelines' framework.</u>

This Court has full authority to consider any evidence it wishes in deciding whether or not the guidelines "properly reflect § 3553 considerations[.]" *Rita v. United States*, 551 U.S. 338, 351 (2007); *see also Gall v. United States*, 552 U.S. 38 (2007); *Kimbrough v. United States*, 552 U.S. 85 (2007). When promulgating Guidelines ranges for drug offenses, the Sentencing Commission did not use the empirical approach used for other cases. *See Kimbrough*, 552 U.S. at 96; *Gall*, 552 U.S. at 73 n.2 ("[T]he Sentencing Commission departed from the empirical approach when setting the Guidelines range for drug offenses, and chose instead to key the Guidelines to the statutory mandatory minimum sentences that Congress established for such crimes.") (*citing* U.S.S.G. § 1A1.1 (2006)). "[T]he Guidelines ranges for drug trafficking offenses are not based on empirical data, Commission expertise, or the actual culpability of defendants. . . . Instead, they are driven by drug type and quantity, which are poor proxies for culpability." *United States v. Diaz*, 11-CR-821-2 (JG), 2013 WL 322243 at *1 (E.D.N.Y. Jan. 28, 2013). These guidelines resulted in unintended consequences and overly harsh guideline ranges for low-level couriers, like Mr. Santos, who have no decision-making power over the weight of the drugs they carry. For this policy reason, the Court should find that the guideline range is too high for Mr. Santos.

<u>The § 3553(a) factors support a non-incarceratory sentence.</u>

Pursuant to 18 U.S.C. § 3553(a)(6), in determining a sentence that is sufficient, but not greater than necessary, the Court "shall consider" "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." In this District, a sentence of time served for people who are drug couriers, like Mr. Santos, has become commonplace. *See, e.g.*; *United States v. Elijah Davis*, 21-CR-446 (ARR) (supervised release); *United States v.*

9

*Leacock*, 21-CR-225 (BMC) (time served one day); *United States v. Dennis*, 18-CR-145 (JBW) (time served one day); *United States v. Ramkissoon*, 17-CR-680 (AMD) (time served 10 days); *United States v. Hendricks*, 17-CR-648 (RRM)(time served one day); *United States v. Chevelle Nesbeth*, 15-CR-18 (FB) (1 year probation, 6 months home confinement and 100 hours community service); *United States v. Shanita Willis*, 14-CR-573 (ARR) (probation); *United States v. Segunda De La Rosa*, 15-CR-234 (RJD) (time served one day, 2 years supervised release); *United States v. Kemar Elliott*, 14-CR-574 (SJ) (time served one day, 2 years supervised release); *United States v. Tamera Keeney*, 15-CR-66 (SJ) (probation); *United States v. Khalilia Gunter*, 15-CR-172 (SLT) (time served 4 days, 3 years supervised release); *United States v. Taleta Phillips*, 12-CR-212 (FB) (time served one day, 3 years supervised release); *United States v. Ramrattan*, 16-CR-239 (JBW) (time served, 4 months); *United States v. Cadet*, 16-CR-134 (SJ) (time served, 4 months); *see also United States v. Shonell Clarke*, 19-CR-67 (BMC) (time served for second drug importation offense); *United States v. Willisza Douglas*, 19-CR-388 (FB) (one year probation). Here, Mr. Santos' case falls squarely in line with other courier cases in this District. As the PSR makes clear, Mr. Santos had a minimal role in the offense. It is axiomatic that "[i]mprisonment is not the only way we punish." *United States v. Zimmerman*, 2012 WL 3779387 (E.D.N.Y. 2012) (citing *Gall*, 552 U.S. at 48–49).

Further, Mr. Santos' history and characteristics support a non-incarceratory sentence. As noted above, Mr. Santos' stable childhood was interrupted by the shock of moving to the U.S. at 12, where he bore witness to pervasive violence that claimed the lives of numerous close friends. He further had to leave school early when he became a father at 18. However, he rose to the occasion and overnight became a devoted parent who worked two jobs to provide for his young family. Mr. Santos' three children mean the world to him, and he is actively involved in their lives. His life has now come full circle as his mother has rejoined him in the U.S. and he lives with his father and stepmother. They form a tight-knit village that is there to support the next generation in the family. As several people in Mr. Santos' family rely on him for financial support, most especially his children, a term of incarceration would have ripple effects throughout his family.

10

## CONCLUSION

For the foregoing reasons, we request that the Court issue a non-custodial sentence, as such a sentence would be not greater than necessary to achieve the goals of sentencing.

Respectfully submitted,

/s Karume James
Karume James
    Attorney for Adderly Rafael Santos Familia
    Assistant Federal Defender
Ernesto Casillas
    Legal Intern
Federal Defenders of New York
(347) 638-3098
karume_james@fd.org


cc:    AUSA James Simmons (by ECF and email)
       Chambers of the Hon. Rachel P. Kovner (by email)